**HOFFMAN et al. v. UNITED STATES.**

District Court, S. D. Illinois, N. D.
February 24, 1927.

No. 2293.

Internal revenue ⚖=7(28)—Private bank, organized under agreement called and intended as one of partnership, held not subject to income tax as corporation (Revenue Act 1918, § 1 [Comp. St. § 6371¼a]).

A private bank, organized under what was called and intended as an agreement of partnership, which did not provide for capital stock nor purport to limit liability of the numbers as to third persons, but provided that each member should share in profits and liabilities in proportion to capital contributed, and that acts of the cashier, who must be a member and was business manager, within the scope of his authority, should be binding on all members, did not attempt to debar any member from the right to file a bill in equity for dissolution, and provided that any member might sell and transfer his interest, but only subject to approval of a majority of the members, *held* a partnership, and not a corporation, within Revenue Act 1918, § 1 (Comp. St. § 6371¼), and not subject to income tax.

At Law. Action by George E. Hoffman and others, doing business as the Walnut Bank, against the United States. Judgment for plaintiffs.

J. Earl Houston and C. C. Dickman, both of Peoria, Ill., for plaintiffs.

Walter M. Provine, U. S. Atty., of Taylorsville, Ill.

FITZHENRY, District Judge. This is an action against the United States under the Tucker Act (24 Stat. 505). Petitioners attempted to organize a partnership to conduct a banking business under the firm name and style of "the Walnut Bank," of Walnut, Ill. The collector of internal revenue, upon investigating the organization of the firm, concluded it was a joint-stock company or association within the meaning of the Revenue Law of 1918 (40 Stat. 1057), and required the bank to make out corporate income tax returns and to pay income taxes for the calendar years 1918, 1919, and 1920. The taxpayer went into liquidation in 1920, filing a claim with the Commissioner for a refund of the taxes paid, upon the theory that it was a partnership and the taxes had been illegally extended and collected.

Taxes were paid under protest as follows: For the calendar year 1918, March 28, 1919, $140, May 22, 1919, $156, and December 5, 1921, $151.61, making a total for that year of $447.61; for the taxable year 1919, March 13, 1920, $206.60, June 2, 1920, $206.76, September 8, 1920, $784.06, making a total for

the year 1919 of $1,574.79; for the taxable year 1920, March 21, 1921, $1,175.37, June 16, 1921, $1,175.37, September 12, 1921, $1,175.37, December 9, 1921, $1,175.37, totaling for the year 1920 $4,701.48.

The pivotal point in this case is whether or not the Walnut Bank was a partnership or a corporation, within the meaning of the Revenue Act of 1918. If it was a partnership, as is contended by petitioners, then the tax was erroneously collected, and should be refunded. If otherwise, the tax was legally and lawfully collected, and the prayer of the petition should be denied.

Title 1, section 1, of the Revenue Act of 1918 (Comp. St. § 6371¼a), provides:

"That when used in this act—

"The term 'person' includes partnerships and corporations, as well as individuals;

"The term 'corporation' includes associations, joint-stock companies, and insurance companies. * * * *"

Title 2, part 2, section 218 (Comp. St. § 6336⅛i), provides:

"That individuals carrying on business in partnership shall be liable for income tax only in their individual capacity."

The stipulation of fact submitted in this cause admits substantially the facts as alleged in petitioners' petition, except (1) that it is not agreed that the Walnut Bank was a partnership; and (2) that petitioners' claim to a refund of the taxes collected for the calendar year 1918, in the sums of $140 and $156, paid March 28, 1919, and May 22, 1919, respectively, are barred by the statute of limitations.

The contract defining the rights, duties, powers, privileges, and relations of the petitioners in their enterprise of the Walnut Bank is set out in hæc verba in the petition, and admitted by the stipulation to be a correct copy of the contract. The preamble to the contract is as follows:

"Articles of agreement, entered into by and between the members of the firm or copartnership known and doing business under the name and style of 'the Walnut Bank.'

"Whereas, it is deemed best by the members of the firm known as 'the Walnut Bank' that written articles of agreement be drawn up and executed for the purpose of fixing the rights and liabilities of the members thereof, as well as to govern the operations of said bank;

"And whereas, the members thereof are also desirous of agreeing upon some plan by means whereof the real estate belonging to said bank may be placed on the hands of some

person as trustee for the use and benefit of said bank and the members thereof:

"Now, therefore, know all men by these presents that we [naming petitioners with one exception], the persons constituting the *partnership firm* known as 'the Walnut Bank,' do hereby agree and bind ourselves as follows, to wit." (Italics ours.)

Article I, paragraphs 1 to 4, inclusive, represent that the firm name shall be "the Walnut Bank"; that its business shall be that of private banking, and its place of business Walnut, Bureau county, Ill.; that the interest of each member shall be evidenced by a ledger account, showing the amount of the working capital furnished by said member. Paragraph 5 is as follows:

"Each of the members thereof shall be entitled to his or her proportionate share of the earnings of said bank, and shall be liable for his or her proportionate share of all expenses, and losses, in accordance with the amount of money invested in said firm by him or her, and in the final settlement of the affairs of said bank shall be entitled to his or her share of the proceeds derived from the sale and conversion into money of the assets thereof."

Article II provides for the officers of the bank, a president, vice president, cashier, and assistant cashier. The president's duties were limited to presiding at all meetings and to advise the cashier. The vice president was to act in the stead of the president, when absent, sick, or unable to attend to the duties. The cashier was to be the active manager of the bank and the custodian of all its cash, notes, books, and other assets and personal property; he was to keep the books, the minutes of all meetings, and "perform to the best of his ability all duties required of him by the members, and all duties customarily performed by such officer in conducting the affairs of a private bank. He shall keep a ledger, wherein shall be entered the name and post office address of each member of the firm, together with the amount contributed by him or her."

"While acting within the scope of his duty he is authorized to bind the bank and the members thereof."

The assistant cashier was to work under the advice and direction and subject to the dictation and control of the cashier.

Article III provided for an annual meeting on the second Wednesday in January; special meetings might be called; all meetings to be held at the bank; each member of the firm to be entitled to one vote for each $100 invested by him or her, and standing in his or her name on the register of the bank;

no business to be transacted at any meeting, unless members owning or authorized to vote by proxy a majority of the capital of said bank are present. A member might be permitted to vote the interest of another member, if authorized by proxy, but no person not a member was permitted to be present and take part in any of the meetings of the bank, even though authorized by power of attorney or otherwise so to do by any member thereof, unless permitted so to do by a majority in interest of the members present at the meeting:

"7. At any meeting of said bank no resolution or motion shall be declared to have been carried unless a majority in interest of the capital represented by the members present shall have been voted in the affirmative."

By paragraph 8 officers were to be elected at the annual meeting and salaries of officers fixed for ensuing year. "*No person not a member of said bank shall be eligible to the office of president, vice president, or cashier.*"

Paragraph 9 provided that the annual meeting shall fix dividends, and the amount to be placed to surplus, if any; 10 provided that dividends were payable only to members, of record at the time the dividends were declared; 11 provided for the appointment of an auditing committee other than the officers of the bank; 12 prescribed their duties—to examine the books, notes, moneys, and all credits, and all indebtedness of the bank, and the methods used in the transaction of business, and to verify the statement of the cashier of the condition, and make and sign a written statement or report of the condition, of the bank, together with any recommendations which it deems necessary in regard to the management of the bank, and present the same at the next meeting for action. Any recommendations made by the committee shall be acted upon at the annual meeting.

Paragraphs 13, 14, and 15 of article III are as follows:

"13. Any member shall be permitted to sell and transfer all or any part of the capital of said bank furnished by him or her and he or she shall, in writing, request and authorize the cashier of said bank to transfer the same on the register of said bank.

"14. The sale or assignment of any such capital by any member shall not in any way release him or her from any liability as one of the members of said bank nor confer upon the person who has bought the same the right to become a member of said bank or to receive any dividends or earnings from said capital nor to have any interest vested in him and the same transferred in his name upon the register until said assignment has first

been sanctioned by a vote of the members of said bank and the person who has become such assignee has signed these articles of agreement and become bound by the same.

"15. The sale and transfer of the interest held by any of the members, when sanctioned as above, shall divest such member of all his interest, legal or equitable, in said bank and the assets thereof, including any and all interest in any real estate held by any person in trust for said bank and release him or her from all liabilities by reason of having been a member thereof and shall invest the purchaser thereof with all the rights of the original holder of said interest and subject him or her to all the liabilities of such original holder and of the members thereof.

"Any member may by will bequeath such interest as he may own to whomsoever he may see fit and such legatee shall be entitled to become a member of said firm and have said interests transferred to him by subscribing these articles of agreement and becoming bound by the same as provided in case of sale and transfer of interest provided further that such devisee shall be entitled to become a member of the said firm and have such interest transferred to him or her only upon the terms and conditions expressed in sections 13, 14 and 15 of article III of this agreement.

"The sale and transfer of interest by the executor, administrator or legal representative of a deceased member shall be subject to the conditions imposed by sections 13, 14 and 15 of article III of this agreement. In case a devisee for any reason shall not be permitted to become a member of said firm and have the interest devised to him transferred upon the books of said bank, and in case of a sale and transfer of interest by the executor, administrator or legal representative of a deceased member and the person to whom such interest was so sold and transferred is not permitted to become a member of said firm, then and in every such case it shall be the duty of said bank and the members thereof to pay the person legally holding said interest its fair market value.

"Neither the retiring of any member, the sale and transfer of any interest by any member, the coming in of a new member or the death of any member shall operate to work a dissolution of said bank."

Article IV provided that all real estate owned or held in trust for the firm, and all which may hereafter be acquired, shall be deeded to some person in trust for the benefit of the individual members of said firm. A member was held competent to hold the le-

gal title in trust and the trustee selected by the members at a regular or special meeting, was to be compensated and to hold the legal title of real estate for the benefit of the members, subject to the direction of and in accordance with the instructions of a majority in interest of the members of the firm. The trustee was required to keep the buildings on the real estate in good repair, rent and collect the rents therefrom, keep them insured, etc.

The articles of agreement were signed by all of the persons named in the preamble, including Mary A. Ross, who immediately thereafter assigned her interest in the partnership to L. M. Eckert, one of the petitioners, with the unanimous consent of all of the other members, and D. M. Eckert then signed the contract.

Albert M. Richardson, one of the persons mentioned in the preamble, died testate; Mary C. Richardson was appointed executrix of the will, and was still acting at the date of the filing of the bill, the estate not having been closed.

Petitioners pray for an order that United States of America pay to the petitioners the sum of $6,723.88, with interest thereon from October 25, 1922.

A reading of the articles of agreement discloses: (1) There is no capital stock, and the parties themselves thought they were forming a copartnership for the conduct of a private banking business at Walnut, Ill., under the firm name and style of "the Walnut Bank." (2) That no effort was made to limit the liability of the members of the firm as to third parties. (3) As between themselves, their interests in the profits of the business, as well as its assets, upon being wound up, and its liabilities, there was a limitation, based upon the amount of money invested in the firm by each member. (4) The cashier was to run the business, and apparently be the practical man in the enterprise; he was to have an assistant, while the president was to preside at all meetings of the bank and to advise with the cashier; the vice president was to act in the president's stead when he was unable to act or not present. (5) No person not a member of the bank was eligible to be president, vice president, or cashier. (6) The acts of the cashier within the scope of his authority was to bind the entire membership. (7) There is nothing in the contract which limits the power of any member to bind the entire firm. (8) A member was permitted to sell his interest, subject to the condition, however, that such sale or assignment "has first been sanctioned by a vote of the members of

the bank and the person who has become such assignee has signed these articles of agreement and become bound by the same." (9) There was a provision that "neither the retiring of any member, the sale and transfer of any interest of a member, the coming in of a new member, or the death of any member shall operate to work a dissolution of the bank." (10) The title to all real estate owned by the bank was to be sold by a trustee for the benefit of the members. (11) The contract does not waive or release the right of a member to file a bill in equity to dissolve the partnership.

On behalf of the government it is contended that the case of Burk-Waggoner Oil Association v. Hopkins (D. C.) 296 F. 492, affirmed 269 U. S. 110, 46 S. Ct. 48, 70 L. Ed. 183, should control the disposition of this case, and that it sustains the collection of the taxes. In the Burk-Waggoner Oil Association Case, supra, the facts were entirely different from those shown by the record in this case. In that case there was also a written agreement, which discloses: (1) That the persons there interested intended to form an "unincorporated joint-stock association," to continue during the lives of the organizers (six individuals) and for 21 years after the death of the one who died last, unless sooner dissolved. (2) The purpose of the organization was to purchase or lease lands containing oil, and to engage in the business of mining, manufacture, sale, and transportation of oil and its products. (3) There was a capital stock of $100,000. (4) Certificates therefor to be issued by the board of trustees and countersigned by the secretary. (5) Each certificate refers to the plaintiff as the joint-stock association. (6) No member of the company, or owner or holder of a certificate, should have the authority, power, or right to transact any business whatever on behalf of or binding on the company, or any member thereof, and no member of the company should be personally liable for any debts, etc., beyond the payment in full of the price for which the share or shares were sold individually by the company. (7) The shareholders had no right of partition, nor of dissolution of the trust. (8) Death, insolvency, or bankruptcy of any member, or transfer of his interest, should not work a dissolution, nor should it entitle any one to an action or proceeding in law or equity against the members, trustees, officers, or property. (9) The affairs of the Burk-Waggoner Oil Association were to be managed by a board of six stockholding trustees. (10) Title to all property

was held in the name of the trustees, who would hold it as joint tenants. (11) The trustees could sue and be sued, or the company might sue and be sued in the company name, as provided by the statutes of Texas. (12) The trustees had full power and authority to conduct the affairs of the business. (13) In case of vacancy on the board, the remaining members might fill the same. (14) The board would select managers and employees as they deemed necessary, and declare and pay dividends as they might deem expedient. (15) The board had no power to bind the shareholders or members personally. (16) In every written contract entered into by the trustees, they were required to refer to the declaration of trust, and any one contracting with them should look only to the funds and property of the company for the payment of the debt or judgment. (17) Neither the trustee nor the shareholders should be personally liable for any debt. (18) No trustee should be liable for any fraud or error or negligence of a cotrustee; and there was a method provided by which he might relieve himself from liability to shareholders for any act of the board which he did not approve.

The District Court for the Northern District of Texas very properly held (296 F. 492) that the Burk-Waggoner Oil Association was a joint-stock company, and taxable as a corporation under the statute here involved. When that case reached the United States Supreme Court, it was held that the rule announced in Hecht v. Malley, 265 U. S. 144, 44 S. Ct. 462, 68 L. Ed. 949, which grew out of a consideration of the so-called "Massachusetts Trusts" Cases, applied; that an association like the Burk-Waggoner Oil Association, by virtue of section 1, was subject to the special excise tax imposed by the Revenue Law of 1918 on every domestic corporation. The court said:

"It is clear that Congress intended to subject such a joint-stock association to the income and excess profits taxes as well as to the capital stock tax. The definition given to the term 'corporation' in section 1 applies to the entire act. The language of the section presents no ambiguity. Nor is there any inconsistency between that section and sections 218a and 335c [Comp. St. §§ 6336⅛i, 6336⅞n] which refer specifically to the taxation of partnerships. *The term partnership as used in these sections obviously refers only to ordinary partnerships. Unincorporated joint-stock associations, although technically partnerships under the law of many states,*

*are not in common parlance referred to as such. They have usually a fixed capital stock divided into shares represented by certificates transferable only upon the books of the company, manage their affairs by a board of directors and executive officers and conduct their business in the general form and mode of procedure of a corporation.* Because of this resemblance in form and effectiveness, these business organizations are subjected by the act to these taxes as corporations."

In Hecht v. Malley, supra, the Supreme Court was discussing the Hecht Real Estate Trust, the Haymarket Trust, and the Crocker, Burbank & Co. Association. These trusts are such as are commonly referred to as "Massachusetts trusts" and were unincorporated. The features of all three were described by the court. The description of one of them is sufficient here (page 148 [44 S. Ct. 463]):

"The Haymarket Trust is strictly a business enterprise. It was established by the original subscribers who furnished the money for the purchase of a building in Boston used for store and office purposes. The shares are of the par value of $100 each. Except as otherwise restricted, the trustees have general and exclusive powers of management, but no power to bind the certificate holders personally. At any annual or special meeting of the certificate holders, they may fill any vacancies in the number of trustees, depose any or all the trustees and elect others in their place, authorize the sale of the property or any part thereof, and alter or amend the agreement of trust."

A consideration of the entities discussed by the Supreme Court in Burk-Waggoner Oil Association, supra, and Hecht v. Malley, supra, discloses that these associations have a number of marked similarities as to corporate form: (1) In them the business is managed by directors or other designated officers; (2) the organization is recognized as a body separate and distinct from its component members; (3) the transferability of membership is governed by the will of each individual member; (4) the association has no inherent right to decide what new members shall be admitted; (5) between the members there may be no special relation of confidence and the retirement or death of a member does not necessarily work the dissolution of the organization.

In the Walnut Bank it must be observed: (1) No member is at liberty to retire and substitute another in his place as a partner, except upon the consent of the other members. (2) The right of delectus personarum is pre-

served. (3) The members were undoubtedly drawn to each other by feelings of mutual confidence. (4) The firm was not a person, separate from its component members. (5) The business was managed by members, through the cashier, who must also be a member, who acts for himself as principal, in his own behalf, and as agent for his copartners.

In the articles of agreement of the Walnut Bank there was but a single provision which is suggestive of a joint-stock company feature, being the last sentence in article III, paragraph 15, which is:

"Neither the retiring of a member, the sale and transfer of any interest by a member, the coming in of a new member, or the death of any member shall operate as a dissolution of the bank."

The intention of the members as to this paragraph in the contract, considered in the light of the provisions of the entire instrument, might as well be interpreted as a provision for the continuance of the "business," as distinguished from the partnership, as otherwise. The legal effect of this contract was that, if one of the members should drop out, the remaining members would continue the business and the partnership with the new member or members, upon the new member or members being accepted and assuming the liabilities carried in the original contract, and upon that basis. If there were no pertinent provisions in this contract, and the word "bank" in the sentence last above quoted was interpreted to mean firm or partnership, the contention of the government as to this provision would be of more force. However, when construed in the light of the entire instrument and the evident intention of the contracting parties, it is not sufficient to change the character of the enterprise in which the petitioners were engaged from that of a partnership to a corporation, within the meaning of the Revenue Act.

Petitioners contend that the rules and regulations of the Commissioner of Internal Revenue, known as articles 1501, 1502, and 1503 of Regulation No. 45, governing the enforcement of the Revenue Act of 1918, are clear acts of legislation, and therefore unconstitutional and void. Article 1501 is not susceptible of this charge, especially at the instance of petitioners in this case.

When the phrase in article 1502, "which act or do business in an organized capacity," is construed to mean a body of persons united without a charter, "but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise," it

would be a valid regulation. Hecht v. Malley, 265 U. S. 144–157, 44 S. Ct. 462, 68 L. Ed. 949. The words "organized capacity" should not be so construed as to apply to an ordinary partnership, and this undoubtedly was not the intention of the Commissioner.

Article 1503 of Regulation No. 45 is as follows:

"*Association Distinguished from Partnership.*—An organization, the membership interests in which are transferable without the consent of all the members, however the transfer may be otherwise restricted, and the business of which is conducted by trustees or directors and officers without the active participation of all the members as such, is an association and not a partnership. A partnership bank, conducted like a corporation and so organized that the interests of its members may be transferred without the consent of the other members, is a joint-stock company or association, within the meaning of the statute. A partnership bank, the interests of whose members cannot be so transferred, is a partnership."

The words "an organization" undoubtedly mean such an entity as was referred to in article 1502, when it was referring to persons who act or do business in an "organized capacity," just above referred to. In addition to the description contained in the first phrase of the first sentence is added the limitation, "and the business of which is conducted by trustees or directors and officers without the active participation of all the members as such, is an association and not a partnership." When, in the articles of copartnership of the petitioners, the provision authorized a member to sell his interest, but only upon the vote of the other members of the partnership, it was not granting such a right as was referred to in the first sentence of the regulation. The partnership bank referred to in the second sentence of the regulation, which was construed to be a joint-stock company or association, was one "conducted like a corporation." The partnership bank referred to in the last sentence of 1503 is a description of the Walnut Bank.

When considered in the light of what has just been said, we believe article 1503 is a valid regulation, and intended to aid in the collection of taxes from joint-stock companies or associations intended by Congress to be taxed. In Burk-Waggoner Oil Ass'n v. Hopkins, supra, the constitutionality of the act was attacked upon the theory that to construe the Burk-Waggoner Oil Association a corporation, within the meaning of the act, is violative of the Constitution of the United States. The Supreme Court said:

"The claim that the act, if so construed, violates the Constitution is also unsound. It is true that Congress cannot make a thing income which is not so in fact. But the thing to which the tax was here applied is confessedly income earned in the name of the association. It is true that Congress cannot convert into a corporation an organization which by the law of its state is deemed to be a partnership. But nothing in the Constitution precludes Congress from taxing as a corporation an association which, although unincorporated, *transacts its business as if it were incorporated.*"

The italicized words clearly and unmistakably describe the companies or associations which Congress intended to be taxed as corporations by the Revenue Act of 1918, and it was also such an organization as "transacts its business as if it were incorporated" that the Commissioner in promulgating articles 1502 and 1503 was endeavoring to describe. In our judgment, the Walnut Bank, admittedly a partnership, was not organized and did not transact its business as if it were incorporated, and was not a corporation, within the Income Tax Law of 1918, or Regulation No. 45 promulgated by the Commissioner under the act.

Therefore we conclude that the Walnut Bank, during the years 1918, 1919, and 1920, was an ordinary partnership, doing a private banking business at Walnut, Ill., not a joint-stock company or association, or a corporation, within the meaning of the Revenue Act of 1918, and taxable as such; that the corporation tax collected by the government from petitioners, doing business under the name and style of the Walnut Bank, for the years 1918, 1919, and 1920, were illegally and unlawfully collected, and should be returned, except the sums of $140 and $156, paid by petitioners March 28, 1919, and May 22, 1919, respectively, which have been barred by the statute of limitations.

The court finds the issues for the petitioners, and that they are entitled to recover of and from the United States of America the sum of $6,427.88, with interest thereon from the dates of the several collections, shown by the holdings filed herewith.